ATTORNEYS FOR THE RESPONDENT
Jon Laramore
Terry E. Hall
Indianapolis, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Donald R. Lundberg, Executive Secretary
David B. Hughes
Indianapolis, Indiana



## In the
## Indiana Supreme Court

No. 49S00-0506-DI-302

IN THE MATTER OF:

JAMES R. RECKER,

*Respondent.*

Attorney Discipline Action
Hearing Officer Daniel J. Pfleging

**March 11, 2009**

**Per Curiam.**

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. The Respondent's 2000 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. See IND. CONST. art. 7, § 4. We find that Respondent, James R. Recker, did not engage in attorney misconduct.

## Background

The primary issue in this case is whether Respondent and attorney Laura Paul ("Paul") were "associated in a firm" at the time of the relevant events such that Paul's client was also deemed to be Respondent's client.

At all relevant times, there was no centralized public defender office in Putnam County. Indigent defense in Putnam County was provided by each trial court's appointment of a part-time public defender. The Putnam Circuit Court contracted with Respondent to handle its indigent defense cases, and the Putnam Superior Court contracted with Paul for its indigent defense cases. Both Respondent and Paul also maintained private practices, with Respondent's private office in Indianapolis and Paul's in Terre Haute.

Putnam County provided office space in the old law library of its Courthouse for the attorneys providing indigent defense ("PD offices"). In part because of budgetary constraints, the County did not install doors on the cubicles in the PD offices and funded only one incoming phone line. The hearing officer found that, despite the tight quarters, conversations in one cubicle could not normally be heard outside that cubicle. The County provided generic letterhead listing both courts and the words "Office of the Public Defender," without a listing of attorneys. Part-time secretarial assistance was provided by court employees hired by the judges. One of the secretaries who served as the office manager kept all public defender files in a central location and allowed files to be checked out only to attorneys who had entered an appearance in that particular case.

In 2004, Respondent was appointed to represent "AB," who was charged with battery resulting in the death of his girlfriend's child. Respondent also was appointed to represent AB in a Child in Need of Services ("CHINS") proceeding involving his own child. Subsequently, AB hired James Holder ("Holder"), a private attorney, to represent him in the criminal case, but Respondent continued to represent AB in the CHINS proceeding.

Meanwhile, Paul was appointed to represent "XY" in a criminal case pending in Superior Court. AB, XY, and at least one other person were housed in the same holding cell in the Putnam County jail. On February 10, 2005, Timothy Bookwalter ("Bookwalter"), the prosecutor of Putnam County, met with Paul in the PD offices and told Paul that XY had passed a note to the sheriff stating that AB had told XY some details of the alleged battery, but that XY wanted to speak with his attorney before telling more. Paul believed that Bookwalter was suggesting a deal for XY in exchange for providing information on AB. Respondent was not in the PD offices at this time.

When Respondent returned to the PD offices, Paul told him of her conversation with Bookwalter, revealing AB's name but not XY's. Because she had not experienced this situation before, she asked Respondent what she should do. Paul did not know that Respondent represented AB. Respondent believed that the client Paul was representing was a private client.

After his conversation with Paul, Respondent called Holder and told him that AB was talking about his case to his cellmates. Holder contacted AB, who suspected the informant was XY. When Bookwalter learned of the situation, he contacted the jail and had XY removed from the cell he shared with AB. Eventually, the State charged AB with murder, XY testified at AB's trial, and AB was convicted of murder.

The Commission filed a verified complaint on June 27, 2005, charging Respondent with violating the following Indiana Professional Conduct Rules:

➢ 1.6(a), which prohibits revealing information relating to representation of a client without the client's informed consent.

➢ 1.8(b), which prohibits using information relating to representation of a client to the disadvantage of the client without the client's informed consent, as imputed to Respondent by Rule 1.8(k).

➢ 1.8(k), which provides that while lawyers are associated in a firm, certain prohibitions that apply to any one of them applies to all of them.

The hearing officer filed findings of fact and conclusions of law ("Findings") on January 8, 2008, concluding Respondent did not engage in misconduct. The Commission filed a petition for review by this Court.

## Discussion

The key issue in this case is whether Respondent and Paul were members of a "law firm" when the relevant events occurred. Professional Conduct Rule 1.0 contains the following definition:

> "Firm" or "law firm" denotes a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation **or other organization.**

(Emphasis added.) The following comment to this rule provides further guidance:

> [2] Whether two or more lawyers constitute a firm . . . **can depend on the specific facts.** For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they **present themselves to the public** in a way that suggests that they are a firm or **conduct themselves as a firm**, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have **mutual access to information concerning the clients they serve**. Furthermore, it is relevant in doubtful cases to **consider the underlying purpose of the Rule that is involved**. A group of lawyers could be regarded as a firm for purposes of the Rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the Rule that information acquired by one lawyer is attributed to another.

(Emphasis added.)

The Court first addressed the issue of whether an office-sharing arrangement constituted a firm under the Professional Conduct Rules in Matter of Sexson, 613 N.E.2d 841 (Ind. 1993). In that case, the respondent, an attorney named "Thompson," and four other attorneys maintained offices at one location. All attorneys shared one secretary, used a common letterhead as

4

stationery, and used three common telephone lines.  They left their offices unlocked and the doors open.  Conversations in the individual offices could be heard in a common hallway.

Thompson was retained by a couple, Mr. and Mrs. Zimmerman, to handle a personal injury claim in which they were the plaintiffs.  While that claim was still pending, Mr. Zimmerman filed for dissolution of marriage, and Mrs. Zimmerman retained Respondent to represent her.  Respondent was charged with professional misconduct based on this representation.  It was undisputed that Thompson would have been disqualified from representing Mrs. Zimmerman in the dissolution action.  The issue was whether Thompson's disqualification should be imputed to Respondent, which depended on whether the office sharing arrangement constituted a "firm."  The Court concluded it did:

> In the present case, Respondent, Thompson, and the other attorneys used common letterhead, shared phone lines, had apparent access to each other's confidential information, and shared office personnel.  When Mr. Zimmerman made arrangements to get his settlement check [from the personal injury case], he was greeted by Respondent with a restraining order prohibiting him from negotiating the check.  It was reasonable for Mr. Zimmerman to assume that Thompson and Respondent were part of a "firm", and it was equally reasonable for Mr. Zimmerman to conclude, that under these circumstances, Respondent engaged in adverse representation.

Id.  For engaging in the representation of a client that was directly adverse to the interests of another client, the Court imposed a public reprimand.

While some of the factors the Court found relevant in Sexson are present in the current case, there are key differences.  Although the common space, staff, letterhead, and phone line might in some circumstances tend to give the impression that Respondent and Paul constituted a firm, the attorneys did not choose or have any say about those trappings, which were provided by the Putnam County courts.  They did not hold themselves out for business of any sort to members of the public at this location.  Rather, they worked at this location only on court-assigned cases, and each attorney was assigned cases only from the court that retained that attorney.  Although the Commission and Respondent disputed how much access each attorney had to the other's client files, the hearing officer resolved this by finding that a secretary provided

5

by the courts kept all the files in a central location and released a file only to an attorney who had appeared in that case.

Based on these findings, the hearing officer concluded that Respondent and Paul were not deemed to be members of a law firm while providing indigent defense services in Putnam County, and thus Respondent did not owe a duty to XY when he communicated information he had learned from Paul to Holder.

The Court finds the hearing officer's findings supported by the evidence and agrees with his conclusion. There is no uniform system of providing indigent defense in Indiana's 92 counties. For example, indigent defense in Marion County is provided by the attorneys employed by the Marion County Public Defender Agency. In some counties, attorneys providing such services may be considered to comprise one law firm. Under the Putnam County system, however, the public defenders simply share office space and support services provided for their use by the courts. They are not deemed to be members of a firm, at least for the purpose of the rule that information acquired by one lawyer in a firm is attributed to another.

Regardless of whether public defenders in a particular county are considered to be members of a firm, it is imperative that they consider the implications their relationship have on their professional duties to their clients. If the attorneys are deemed to be members of a firm, avoiding improper conflicts of interest must be given a high priority. If the attorneys are considered to be practicing independently, they must take care not to share improperly confidential information about their clients with each other. Attorneys sharing office space, as public defenders or in other contexts, may benefit from consulting with each other about legal issues, but this can be done ethically only after first determining that the interests of both attorneys' clients are not compromised.

In the current case, Paul gave Respondent information about someone, who turned out to be XY, who was acting against his client AB's interests. Because XY was not his client, Respondent did not violate any of the cited provisions in passing on the information he received to AB's other attorney.

6

We express no opinion on whether Paul violated her duty to XY because that issue is not before the Court. We note that it is attorney misconduct to knowingly assist or induce another attorney to violate the rules of professional conduct. *See* Prof. Cond. R. 8.4(a). We express no opinion on whether Respondent had a duty to try to prevent Paul from disclosing confidential client information to him because he was not charged with violation of this rule.[1]

## Conclusion

The Court concludes that Respondent did not commit the attorney misconduct charged and therefore enters judgment in his favor. The hearing officer appointed in this case is discharged.

The Clerk of this Court is directed to give notice of this opinion to the hearing officer, to the parties or their respective attorneys, and to Thomson/West for publication in the bound volumes of this Court's decisions.

Shepard, C.J., and Dickson, Boehm, and Rucker, JJ., concur.
Sullivan, J., dissents with separate opinion.

---

[1] The Commission correctly points out that Paul has not been charged with misconduct and has not had an opportunity to respond to the issues raised in this case.

**Sullivan, Justice, dissenting.**

The central issue in this case is whether the Putnam County public defender's office is a "firm" within the meaning of the Indiana Rules of Professional Conduct. The Court agrees with Respondent that County public defender's office is not a "firm" and, therefore, Respondent had no ethical obligation to keep confidential the secrets of the client of another public defender, Ms. Paul.

I respectfully dissent. I believe that the Court employs an overly technical, indeed, near-sighted, definition of "firm" and in doing so loses sight of the principal interest at stake here: the inviolability of client confidences. And I need hardly mention that that interest is presented in particularly stark relief here as the client was placed in jeopardy of his physical safety by Respondent's actions.

The test here is whether Respondent and Ms. Paul "present[ed] themselves to the public in a way that suggests that they [were] a firm or conduct[ed] themselves as a firm." Because the inviolability of client confidences is one of the bedrocks of our profession, I would apply this test from a reasonable client's (rather than a lawyer's) perspective.

Take the case of a lawyer at Firm A who receives a fax or e-mail from a lawyer at Firm B containing confidential information about one of Firm B's clients. The reasonable client could not conclude that the lawyer at Firm A and the lawyer at Firm B presented themselves to the public in a way that suggested that they were a firm nor that they had conducted themselves as a firm and, as such, the receiving lawyer at Firm A would not have an ethical obligation to keep the information confidential.

But here, Respondent and Ms. Paul worked in adjoining cubicles in a single office with a sign over the entry door that read "Public Defender's Office." There were no internal doors within the office to separate the cubicles. There was common workspace for non-attorney secretarial staff which supported both lawyers. In this common space were the office files of both lawyers. The lawyers shared the same equipment and used the same stationery and telephone

8

system.

I submit that any client, whether telephoning one of these lawyers, receiving a letter from one of these lawyers, or going to an appointment with one of these lawyers at the Public Defender's Office, would reasonably conclude that these lawyers both presented themselves to the public in a way that suggested that they were firm and also conducted themselves as a firm. Indeed, one need not even apply a reasonable client test here as a lawyer -- Ms. Paul herself -- must have thought that she was in the same firm as Respondent or she would not have disclosed confidential client information to him.

Under the Court's opinion, if Respondent, working in his cubicle, overheard a conversation between Ms. Paul and one of her clients, Respondent would have no ethical obligation to keep the overheard information confidential. I submit that our Rules of Professional Conduct mandate a different result. How can "the trust that is the hallmark of the client-lawyer relationship," Ind. Rule of Prof. Conduct 1.6, cmt. 2, exist if the lawyer in the next cubicle can reveal that client's secrets simply because the lawyers are not technically in the same "firm"?

In a law review article entitled, "Public Defender's Office Is a 'Law Firm' for Purpose of Determining Whether Conflict Exists in Representation of Codefendants," the author supports her argument by describing precisely the problem encountered here:

> The close association of the attorneys in the public defender's office makes it possible that confidential information will be inadvertently circulated. The necessity of utilizing the services of the same investigator, the inevitable discussions occurring in the office among the attorneys, and the overlapping sources of information from identical witnesses all contribute to this possibility.

Melanie Hines Alford, Comment, Public Defender's Office Is a 'Law Firm' for Purpose of Determining Whether Conflict Exists in Representation of Codefendants, 5 Fla. St. L. Rev, 492, 504-05 (1977).

Many jurisdictions have adopted this position as a rule of criminal procedure. For example, after the Pennsylvania Supreme Court held that the Public Defender's Association of Phila-

9

delphia constituted a law firm, such that two members of the same firm are prohibited from representing multiple clients with inconsistent defenses, the state's intermediate court of appeals held that the same rule applied to the Carbon County Public Defender's office. This was so even though the lawyers in the Carbon County Public Defender's office worked independently and did not share facilities, staff or files. In fact, they each maintained a private office and utilized their own private secretarial help. Commonwealth v. Green, 550 A.2d 1011 (Pa.Super. 1988), following Commonwealth v. Westbrook, 400 A.2d 160 (Pa. 1979).

Perhaps the Court is concerned that the public defender arrangement here is a common one in our state's Balkanized system of trial courts and that holding it to be a firm would have negative consequences. If so, I do not understand the argument. Even if the two lawyers here are not a "firm," either one is likely to have conflicts of interest in particular criminal cases from time to time that require the appointment of other counsel. Viewed from the perspective of a county with a public defender office that is undeniably a "firm," lawyers in such an office are clearly prohibited from representing clients with inconsistent defenses, regularly requiring other counsel to be secured. While the necessity of securing "conflict" counsel presents some negative fiscal and other consequences in counties large and small, they are part of the price that our legal system has long paid to maintain the inviolability of client confidences in criminal cases. They do not justify a deviation from that principle in the case of this particular public defender's office.

For the reasons set forth above, I believe that the public defender's office here constituted a firm such that Respondent had an ethical duty to keep confidential the client information disclosed to him by Ms. Paul, that by disclosing the information, he violated Prof. Conduct R. 1.6(a), and that by using that information to the client's disadvantage, he violated Prof. Conduct R. 1.8(k).

10